**Becky J. SWARTZ, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 97–60.**

Supreme Court of Wyoming.

Dec. 22, 1998.

Sylvia Lee Hackl, Public Defender; and Donna D. Domonkos, Appellate Counsel (argued), for Appellant(Defendant).

William U. Hill, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Kimberly A. Baker–Musick, Assistant Attorney General; Theodore E. Lauer, Director, Prosecution Assistance Program; and Krista L. Noonan, Student Director (argued), for Appellee(Plaintiff).

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and TAYLOR,* JJ.

LEHMAN, Chief Justice.

Appellant Becky Jo Swartz was convicted of grand larceny for removing a 1987 Camaro from the front yard of her former boyfriend's fiancee. On appeal, Swartz claims error in the district court's refusal to instruct the jury on her defense theory of entrapment. Finding no evidence supporting the elements of her defense, we affirm.

### ISSUES

Swartz presents a single issue for review:

Whether the trial court erred when it refused to give an instruction on the appellant's theory of the case?

The State rephrases the issue as follows:

Did the district court properly refuse to instruct the jury on appellant's alleged defense of entrapment because there was no competent evidence supporting a theory of entrapment?

### FACTS

Swartz and Bryon Scott were romantically involved from February 1994 to February 1996. In 1995, Swartz' financial difficulties rendered her unable to make the payments on her treasured sports car, a 1987 Camaro. To avoid default, Swartz transferred title to Scott, who then borrowed the money necessary to satisfy Swartz' debt on the car. At the time, Scott intended to return title to Swartz when she repaid him the money he borrowed. By June 1996, the loan had been

---

* Chief Justice at time of oral argument; retired November 2, 1998.

paid off, but Swartz had yet to offer any payment to Scott.

Four months earlier, the relationship between Swartz and Scott had ended, and Scott began dating a friend of Swartz, Gina Patenaude. In March or April 1996, Patenaude began to receive threatening midnight calls. Her property was vandalized on several occasions, and she awoke on two successive mornings to discover the tires on both her car and Scott's car had been slashed during the night. Toward the end of June, Patenaude telephoned the Gillette Police Department to report the vandalism, informing Officer Deaton that she suspected Swartz was involved. As a result, police placed a video camera across the street from Patenaude's residence in the last week of June, hoping to film the vandal in action.

On June 30 or July 1, Scott and Patenaude moved the Camaro from Scott's parents' residence, where it had been parked since the transfer of title, to Patenaude's front yard. Scott then placed a sign on the car advertising it "for sale." Although Scott and Detective Shaw of the Gillette Police Department testified that the decision to move the Camaro was Scott's alone, Scott's parents testified otherwise. Scott's father testified that Scott told him the car was moved on the advice of the police to "attract [Swartz'] attention" and "to see what [Swartz] would do with the car." Scott's mother testified that Scott told her the police wanted the Camaro moved because "there was some vandalism done to his car and they wanted to know ... what this would do to her, bringing her car out."

In the early morning hours of July 2, 1996, the video camera recorded a person surreptitiously approaching the Camaro, removing the "for sale" sign, and driving away with the headlights off. At about 2:00 a.m., Swartz was approached by a Gillette police officer and questioned about the theft. Swartz admitted she took the Camaro, but insisted it was her car. She told police that she delivered it to an acquaintance named Lloyd at a prearranged location; Lloyd drove away; and she had no further knowledge of the car's whereabouts.

The next day Swartz was charged with grand larceny in violation of W.S. 6–3–402(a),

(c)(i). At her trial, after the close of evidence, Swartz offered an instruction on the defense of entrapment. The district court refused the instruction, finding the theory unsupported by the evidence presented at trial. During deliberations, the jury sent a note to the court which stated, "Can we use the fact that they entraped (sic) her into stealing the vehicle as a means to reach a verdict?" The trial court met with counsel and again refused to instruct the jury on entrapment, but offered a choice between responding "no" or telling the jury to look at the instructions already given. Counsel for both Swartz and the State opted for the latter choice. The jury found Swartz guilty, and she was sentenced to no less than eighteen months and no more than thirty months in the Wyoming Women's Center. This timely appeal followed.

### STANDARD OF REVIEW

"The general rule in reviewing questions involving instructions is that the trial judge is afforded latitude to tailor the instructions to the facts of the case, and reversible error will not be found as long as the instructions when viewed as a whole and in the context of the entire trial fairly and adequately cover the issues." *Brown v. State,* 817 P.2d 429, 438 (Wyo.1991) (quoting *Scadden v. State,* 732 P.2d 1036, 1053 (Wyo. 1987)). The standard of review for a requested-but-refused jury instruction is established by *Oien v. State,* 797 P.2d 544 (Wyo. 1990) and *Thom v. State,* 792 P.2d 192 (Wyo. 1990). "The refusal to allow an instruction requested by the defendant when due process requires the defendant's instruction be given is reversible error per se." *Oien,* 797 P.2d at 549. "[A] defendant has the right to have instructions on his theory of the case or his theory of defense presented to the jury if the instructions sufficiently inform the jury of the theory or defense and if competent evidence exists which supports the law expressed in the instructions." *Thom,* 792 P.2d at 195. Evidence is competent if a reasonable jury would conclude that it supports the defendant's position, even if, in the opinion of the court, the evidence is weak, inconclusive, or unworthy of belief. *Goodman v. State,*

573 P.2d 400, 409 (Wyo.1977). In determining whether evidence is competent to support an instruction on a defense theory of the case, evidence is to be viewed in a light favorable to the defendant and taken as true. *Chavez–Becerra v. State,* 924 P.2d 63, 67 (Wyo.1996).

### DISCUSSION

■■■ Wyoming recognizes the common law defense of entrapment, which requires a showing that "law enforcement officials, through the use of extraordinary temptation, induce an otherwise innocent person to commit a crime." *Wright v. State,* 851 P.2d 12, 14 (Wyo.1993). The defense has two related elements: 1) government inducement of the crime, and 2) a lack of predisposition on the part of the defendant to engage in the criminal conduct. *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988). The threshold question is whether the police somehow induced the defendant to act illegally or merely provided an opportunity to commit the crime. *Rivera v. State,* 846 P.2d 1, 3 (Wyo.1993). Once it is determined that inducement is involved, the defendant's predisposition comes into question. *Id.*

■■■ Swartz maintains that Scott, acting as an agent of the State, entrapped her into committing the crime of larceny. Swartz' argument is that, because she had a known emotional attachment to the Camaro, placing it in front of Patenaude's house with a "for sale" sign on it was an extraordinary temptation and inducement to commit the crime. We disagree.

■■■ Even accepting as true the testimony of Scott's parents that the police were involved in the decision to move the Camaro, we find no evidence that the State, either through Scott or otherwise, induced Swartz to commit larceny. Suspected persons can be tested by being offered an opportunity to transgress the law, although they may not be put under any extraordinary temptation or inducement. *Noetzelmann v. State,* 721 P.2d 579, 581 (Wyo.1986); *Higby v. State,* 485 P.2d 380, 384 (Wyo.1971). With respect to what constitutes undue persuasion or enticement, the question "is not one of laying a trap or trickiness or deceit, but one of seduction or improper inducement to commit crime." *State v. Akin,* 75 N.M. 308, 404 P.2d 134, 137 (N.M.1965). Inducement may arise from "persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." *United States v. Sanchez,* 88 F.3d 1243, 1249 (D.C.Cir.1996); *United States v. Mendoza–Salgado,* 964 F.2d 993, 1004 (10th Cir.1992); *see also State v. Stahl,* 240 Neb. 501, 482 N.W.2d 829, 838 (Neb.1992).

Here, Scott's actions fall short of the type of behavior that would amount to an inducement to commit larceny. There is no evidence that Scott or any member of the Gillette Police Department had any contact with Swartz before the car was stolen. Nor is there evidence that Scott or the police implanted the idea of the crime in Swartz' mind. *See Mendoza–Salgado,* 964 F.2d at 1002. Scott did nothing more than offer Swartz an opportunity to act; an opportunity she grasped forthwith. Because Swartz presented no competent evidence of improper inducement by the government, she was not entitled to have the defense of entrapment submitted to the jury.

Affirmed.